UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

MARRELL GRAHAM )
)
  Plaintiff, )
)
v. ) CIVIL ACTION
) NO:
)
UNITED STATES OF AMERICA )
)
  Defendant. )
)

## COMPLAINT

### Introduction

1. This action for monetary damages is brought pursuant to the Fourteenth Amendment to the United States Constitution and Title 28 U.S.C. § 2671, et seq. (hereinafter the "Federal Tort Claims Act") and under the common and statutory law of the State of Tennessee. Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1346 (b) and on the supplemental jurisdiction of the court under 28 U.S.C. § 1367(a) for claims arising under state law. Venue is proper under 28 U.S.C. §§ 1391 (a)(1) and (b)(2).

2. Plaintiff alleges that several known and unknown federal officials failed to adequately protect a cooperating individual with the Federal Bureau of Investigation ("FBI") and further failed to recognize the cooperating individual had become a target for murder. These failures led to the untimely death of the cooperating individual on 2/01/1979. The cooperating individual was Plaintiff's father, Samuel Pettyjohn.

## Parties

1. The following person is the plaintiff in this action:

    a. Marrell Graham at all times material to this complaint was and is a resident of Cobb County, Georgia. He is of full age. He is the son of the decedent, Samuel Pettyjohn.

2. The following person is the defendant in this action:

    a. The United States of America is the appropriate defendant under the Federal Tort Claims Act and was at all times material to this complaint the employer of known and unknown FBI Agents.

## Facts

3. Leonard Ray Blanton ("Blanton"), a Democrat, was elected as the 44th Governor of the State of Tennessee in 1975. Blanton served as governor from 1975-1979.

4. Blanton appointed Thomas Edward Sisk ("Sisk") as Chief Legal Counsel for the Governor in 1975.

5. Marie Ragghianti ("Ragghianti") was hired by Sisk to be an extradition officer and handled all communications with the State's Board of Pardons and Paroles for the Blanton administration. She would later sue Blanton for wrongful termination.

6. William Aubrey Thompson ("Thompson") was a Chattanooga, Tennessee business owner and main Chattanooga political contact for Blanton. Thompson was known to have unfettered access to Blanton and his cabinet. Thompson had a reputation for dealing in various types of illegal activities.

7. Samuel Pettyjohn ("Pettyjohn") owned several businesses in Chattanooga, Tennessee.

In addition to his legitimate business interests, Pettyjohn was known to engage in various Illegal activities as well.

9. Pettyjohn owned the Stardust Lounge ("Stardust") which was a restaurant/bar located at or near the 300 block of 9th Street in downtown Chattanooga. Several years later, he owned the Beverage Center located at 2001 Market Street near downtown Chattanooga.

10. In the early hours of 8/29/1974, a bomb ignited on 9th Street in Chattanooga. The blast destroyed Stardust as well as almost an entire city block. The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") investigated the explosion along with the Chattanooga Fire Department ("CFD"). After several years of investigation, the ATF was unable to charge any individuals with the bombing. The investigation went dormant.

11. Pettyjohn and other Thompson confidants received insurance payments for the total property loss suffered during the explosion. These proceeds were paid by Lloyd's of London.

12. Sometime in 1975, an illegal scheme emerged wherein prisoners in the Tennessee Department of Corrections ("TDOC") could pay monies, through intermediaries, to the Blanton administration and to receive early parole.

13. Larkin Bibbs ("Bibbs) was a well-known Chattanooga drug dealer who was convicted of second-degree murder and ordered to serve fifteen (15) years in the TDOC. He began serving his sentence on 8/26/1975.

14. In November of 1975, Thompson visited Bibbs in the TDOC for unknown reasons.

15. In December of 1975, Pettyjohn visited Bibbs in the TDOC for unknown reasons.

16. Pettyjohn secured approximately Fifteen Thousand Dollars ($15,00.00)

and delivered it to Thompson. The funds were procured from several individuals believed to be Chattanooga businesspeople.

17. In late 1975, Bibbs was released from TDOC after serving less than four (4) months of a fifteen (15) year prison sentence.

18. The illegal scheme that allowed Bibbs to leave prison early became known throughout the state and various law enforcement circles. The Federal Bureau of Investigation ("FBI") opened an investigation into the Blanton administration and the parole system known as TENNPAR (Tennessee Parole). Hank Hillin ("Hillin") and other unknown FBI Agents led the investigation.

19. During these times, other prisoners were released early from TDOC. Many of the early releases had Chattanooga ties.

20. Investigative efforts led to raids of Sisk's office in the Tennessee State Capitol in late 1976.

21. Grand juries were convened in Nashville and Chattanooga Tennessee to examine the growing TENNPAR investigation.

22. Pettyjohn appeared before at least one grand jury and gave testimony. He also further cooperated with the FBI regarding the TENNPAR investigation.

23. It is not known how the FBI defined their relationship with Pettyjohn. Generally, the FBI defines individuals from whom they get information as confidential informants, cooperating witnesses, assets, or sources of information.

24. Regardless of the title, Pettyjohn testified before a federal grand jury. In September 1977, Pettyjohn and the FBI met at a clandestine location in Chattanooga

to discuss further aspects of the TENNPAR investigation. At this meeting, Pettyjohn supplied the names of five (5) individuals who paid the proceeds to have Bibbs released early. The names were reduced to a written document that Pettyjohn signed. Upon information and belief, the list of five (5) names became a permanent exhibit to the FBI's TENNPAR investigative file.

25. Sometime in 1978, the ATF reopened their investigation into the 9th Street Explosion based upon newly developed information.

26. The Hamilton County Tennessee Grand Jury indicted Pettyjohn on the charges of murder and arson for his involvement in the 9th Street Explosion. The indictment was returned against Pettyjohn in November 1978.

27. On 12/15/1978, Sisk and several other Blanton administration officials were arrested by the FBI. Thompson was later arrested and indicted for his role in the pardon scandal as well as unrelated tax evasion charges.

28. On 12/18/1978, Blanton was subpoenaed to appear and testify before a coming federal grand jury. Blanton would later publicly state he was a target of the TENNPARR investigation. He had previously announced he would not be seeking a second term as governor.

29. Blanton continued his suspicious activities in January 1979 and commuted the sentences of fifty-two (52) state prisoners. Many had violent convictions. The TENNPAR investigation revealed Blanton was set to release more prisoners.

30. Based upon conversations with federal and state law enforcement, state government officials intervened and removed Blanton from office and Lamar Alexander (Alexander) was

sworn in early as the State of Tennessee's 45th Governor.

31. Pettyjohn provided the FBI vital information about criminal activities of a sitting governor and other powerful individuals. The TENNPAR investigation was reported widely throughout the United States. He was also the main target for the 9th Street Explosion. The FBI never provided any security or protection for Pettyjohn.

32. On 2/1/1979, Pettyjohn was found murdered inside of the Beverage Center. He had been shot four times with three (3) gunshot wounds to the head and one (1) gunshot to the chest. Robbery was not the motive. The Beverage Center's cash register was untouched and Pettyjohn's jewelry valued at over One Hundred Thousand Dollars ($100,000.00) remained on his person.

33. The FBI was on notice that the safety of cooperating TENNPAR witnesses was a serious issue. Bernard Weinthal ("Weinthal") was involved in the pardon scheme by paying Thompson for various individuals. Weinthal later became a cooperating TENNPAR witness and appeared several times before the federal grand jury.

34. In July 1976, Weinthal was found dead under unusual circumstances. At the time, police ruled his death as a suicide.

35. Kevin McCormack ("McCormack") was an assistant to Ragghianti. Ragghianti became aware of the pardon scheme and spoke publicly at the issues. Based upon her knowledge, Blanton terminated Ragghiantil. She later sued Blanton for wrongful termination. McCormack was a witness in her lawsuit against Blanton. In June 1978, law enforcement found McCormack had been strangled to death by an unknown assailant. His body was located at the Capital Park Inn in Nashville. The inn was often the location where monies were advanced to Blanton

administration members in the pardon scheme. It is not known if the FBI provided any information about McCormack to other law enforcement agencies about his testimony against Blanton.

36. Subsequent to Pettyjohn's murder, Ernie Anglin ("Anglin") was found shot to death in the front yard of his Columbia, Tennessee home. Anglin had previously attempted to buy his brother's early release from TDOC. Anglin never wanted to cooperate with the FBI but later told them he would. Several days prior to his FBI meeting regarding cooperation, Anglin was brutally murdered. Anglin's case remains unsolved.

37. Another cooperating witness, Lawrence Verable, was found murdered in his Tennessee home. Verable was known to pay monies to the Blanton administration for the protection of his liquor store.

38. Despite other instances of witnesses being killed, the FBI abandoned Pettyjohn and his safety.

39. As the TENNPAR investigation concluded, Sisk, Thompson, Blanton, and other administration members were convicted of federal crimes dealing with the pardon scheme and the additional investigation into illegal liquor licenses.

40. Pettyjohn's murder remained unsolved.

41. In the 1990s, the FBI began investigating a multi-state bank robbery scheme. The investigation revealed the leader of the robbery gang to be William Edward Alley ("Alley") Alley and other individuals were later indicted and sentenced to federal prison for multiple bank robberies.

42. Information was provided to the FBI by Alley's co-defendants. Such information

7

included the reason(s) why Pettyjohn was murdered and the identity of the murderer.

43. Pettyjohn was murdered because he had cooperated against the Blanton administration during the TENNPAR scheme and other information he had related to other illegal activities like the 9th Street Explosion.

44. Alley was paid by various individuals including some closely connected to the Blanton administration to murder Pettyjohn. On 2/1/1979, Alley carried out the contract murder.

45. It is unknown what the FBI did with the information regarding Pettyjohn's murder that was discovered from the bank robbery investigation.

46. It is unknown what the FBI did with the information about the five (5) names they were provided to by Pettyjohn. These five (5) people would have been considered suspects in Pettyjohn's contract murder.

46. It is known that the FBI never shared any information regarding Pettyjohn's murder with the plaintiff, Marrell Graham.

47. The FBI had a duty to recognize the potential threats posed by Pettyjohn for his cooperation in a highly visible federal investigation.

48. The FBI had a duty to protect Pettyjohn and his family due to his cooperation in a highly visible federal investigation.

49. The FBI had a duty to protect Pettyjohn because they were aware other cooperating TENNPAR witnesses were murdered and/or died under unusual circumstances.

50. The FBI had a duty to protect Pettyjohn because at the time of his cooperation they knew Pettyjohn was terrified for his own safety.

51. The aforesaid acts and omissions of the defendant and its employees were motivated, in part, by the intention of the defendant and its employees to obtain further pertinent information to a federal investigation and successful prosecution(s) despite any dangers subjected to cooperating individuals.

52. As a direct and proximate result of the intentional, reckless and/or negligent actions and omissions of the defendant as set forth above, the plaintiff's father, Samuel Pettyjohn, suffered a wrongful death. As a surviving child, Graham can seek recovery for the wrongful death of his father, including the monetary value of the decedent's life.

53. As a direct and proximate result of the intentional, reckless, and/or negligent actions and omissions of the defendant as set forth above, the plaintiff was deprived of the loss of the income, services, protection, care, assistance, society, companionship, comfort, guidance, counsel, and advice of his father. Plaintiff continues to be deprived of the loss of income, services, protection, care, assistance, society, companionship, comfort guidance, counsel, and advice of his father.

54. As a direct and proximate result of the intentional, reckless, and/or negligent actions and omissions of the defendant as set forth above, the decedent was denied his fundamental right, guaranteed by the 14th Amendment of the United States Constitution, of the right to direct the care, upbringing, and education of the Plaintiff. Plaintiff was denied similar fundamental rights in a relationship with his father, the decedent.

55. The defendant and its employees never shared any of the vital information surrounding

Pettyjohn's murder with Graham or any of his family members. Other than to leave the information stored away in the defendant's investigative case files; it is not known if the defendant did anything with the information surrounding Pettyjohn's murder.

56. In June 2021, a Hamilton County Tennessee Grand Jury returned findings that if Alley were alive today, they would have indicted him for the first-degree murder of Pettyjohn.

57. Prior to the June 2021 grand jury findings, the plaintiff was never made aware of the Information held by the defendant relating to his father's death.

58. It is unknown if the FBI maintained any relationship with Alley.

59. Since the defendant withheld the information from the plaintiff and the rest of society, the plaintiff continues to suffer emotional distress and the losses as alleged in prior paragraphs. Plaintiff continues to search for more truth surrounding his father's untimely death.

60. After the June 2021 grand jury findings, the defendant has failed to share with the plaintiff any information surrounding his father's death.

## COUNT I
### CAUSE OF ACTION AGAINST THE UNITED STATES
### UNDER THE FEDERAL TORT CLAIMS ACT

61. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

62. At all times material to this complaint, the agents and employees of the Department of Justice and the FBI referred to herein, were acting within their scope of employment.

63. The United States, if a private person, would be liable to the plaintiffs for the acts and omissions of its employees and agents described herein under the law of the place

where said acts and omissions occurred.

64. The plaintiff submitted an Administrative Claim to the FBI on or about April 12, 2023. Such claim has subsequently been denied by the FBI.

## COUNT I
## COMMON LAW WRONGFUL DEATH UNDER TENNESSEE LAW

65. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

66. The defendant is liable to the plaintiff for injuries and damages resulting from the defendant's failure to protect Samuel Pettyjohn which lead to his wrongful death.

## COUNT II
## COMMON LAW LOSS OF CONSORTIUM UNDER TENNESSEE LAW

67. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

68. The defendant is liable to the plaintiff for injuries and damages resulting from the loss of consortium the plaintiff has experienced and continues to experience since the death of his father.

## COUNT III
## COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER TENNESSEE LAW

69. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

70. The defendant is liable to the plaintiff for injuries and damages resulting from the intentional infliction of emotional distress that the plaintiff has experienced and continues to experience due to the acts and/or omissions of the defendant.

## COUNT IV
## COMMON LAW NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS UNDER TENNESSEE LAW

71. Paragraphs 1 through 60 are incorporated herein by reference as though fully set forth.

72. The defendant is liable to the plaintiff for injuries and damages resulting from the negligent infliction of emotional distress that the plaintiff has experienced and continues to experience due to the acts and/or omissions of the defendant.

**WHEREFORE,** plaintiff requests that this Court:

1. Award compensatory damages to the plaintiff against the defendant;
2. Award costs and attorney's fees to the plaintiff;
3. Award such other and further relief as this court may deem appropriate.

**THE PLAINTIFF HEREBY DEMANDs A JURY TRIAL ON THOSE COUNTS ON WHICH HE IS ENTITLED TO HAVE A TRIAL BY JURY.**

Submitted this the 16th day of May, 2022

/s/ Neal Pinkston
Neal Pinkston, TN BPR # 021245
Pinkston Law, PLLC
1216 E. Main St., Ste. 206
Chattanooga, TN 37408
(Office Number) (423) 654-8326
mnealpinkston@gmail.com